**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

_____

| | | |
|---|---|---|
| **In the Matter of the Complaint of** ) | | |
| **Operation Bass, Inc., as Owner** ) | | |
| **Pro Hac Vice of the 2011 Ranger** ) | **No. 1:14-cv-01226-STA-egb** | |
| **Z520 20' 9" Boat with Hull** ) | | |
| **Identification Number** ) | | |
| **RGR04271A111, for Exoneration** ) | | |
| **from or Limitation of Liability** ) | | |

_____

| | |
|---|---|
| **In the Matter of the Complaint of** ) | |
| **Fishing Holdings, LLC, as Owner** ) | |
| **of the 2011 Ranger Z520 20' 9"** ) | **No. 1:14-cv-02976-STA-egb** |
| **Boat with Hull Identification Number** ) | |
| **RGR04271A111, for Exoneration** ) | |
| **from or Limitation of Liability** ) | |

_____

**ROBERT GULLEY,**                      )
                                        )
     **Plaintiff,**               )
                                        )
**and**                                 )
                                        )
**THE HARTFORD INSURANCE**              )
**COMPANY,**                            )
                                        )
     **Intervenor Plaintiff,**    )
                                        )
**vs.**                                 )    **No. 1:14-cv-01138-STA-egb**
                                        )
**FISHING HOLDINGS, LLC,**              )
**OPERATION BASS, INC.,**               )
**and SHINICHI FUKAE,**                 )
                                        )
     **Defendants.**              )

_____

**ORDER GRANTING DEFENDANT FISHING HOLDINGS, LLC's MOTION FOR
SUMMARY JUDGMENT;**

**GRANTING IN PART AND DENYING IN PART DEFENDANT SHINICHI FUKAE'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR
MEDICAL EXPENSES;
GRANTING DEFENDANT OPERATION BASS, INC.'s MOTION FOR SUMMARY
JUDGMENT; AND
GRANTING OPERATION BASS, INC.'S MOTION FOR PARTIAL SUMMARY
JUDGMENT ON CLAIMS FOR KNEE AND NECK INJURIES**

_____

The Court sits in admiralty jurisdiction over claims arising from an accident that occurred during the final day of a professional bass fishing tournament. Before the Court are the four Motions for Summary Judgment and Partial Summary Judgment of Defendants Fishing Holdings, LLC ("Fishing Holdings"), Shinichi Fukae ("Fukae"), and Operation Bass, Inc. ("Operation Bass") (collectively "Defendants") on the Jones Act and general maritime law claims of Plaintiff Robert Gulley ("Plaintiff") in this consolidated matter.[1] For reasons set forth below, Fishing Holdings's Motion for Summary Judgment is **GRANTED**; Fukae's Motion for Partial Summary Judgment is **GRANTED IN PART AND DENIED IN PART**; Operation Bass's Motion for Summary Judgment is **GRANTED**; and Operation Bass's Motion for Partial Summary Judgment is **GRANTED**. Accordingly, the Court finds that Operation Bass and Fishing Holdings are entitled to exoneration from all liability regarding the injuries suffered by Plaintiff, and all of Plaintiff's claims against Operation Bass and Fishing Holdings are **DISMISSED**. The Clerk is **DIRECTED** to enter judgment forthwith in favor of Operation Bass and Fishing Holdings as to their Verified Complaints seeking exoneration.

_____

[1] The Court recognizes that only Case Nos. 1:14-cv-01226-STA-egb and 1:14-cv-02976-STA-egb are consolidated, while Case No. 1:14-cv-01138-STA-egb is merely related. *See* Order Consolidating Cases, May 18, 2015, ECF No. 35. But the Court will refer in this Order to three cases together as consolidated simply as a matter of convenience. And unless otherwise noted, all ECF numbers used by the Court are from the lead case: No. 1:14-cv-01226-STA-egb.

## I.   BACKGROUND

### A.   Factual Background

The following facts are undisputed by the parties for the purposes of the instant Motions unless otherwise noted. *See* Statement of Uncontested Facts, June 30, 2017, ECF No. 93 [hereinafter "Fishing Holdings's Statement of Facts"]; Statement of Material Facts in Supp. of Def. Shinichi Fukae's Mot. for Partial Summ. J. on Pl.'s Claim for Medical Expenses, June 30, 2017, ECF No. 94-2 [hereinafter "Fukae's Statement of Facts"]; Statement of Undisputed Material Facts in Supp. of Operation Bass, Inc.'s Mot. for Summ. J., June 30, 2017, ECF No. 95-2 [hereinafter "Operation Bass's First Statement of Facts"]; Statement of Undisputed Material Facts in Supp. of Operation Bass, Inc.'s Mot. for Partial Summ. J. on Claims for Knee and Neck Injuries, June 30, 2017, ECF No. 96-2 [hereinafter "Operation Bass's Second Statement of Facts"]; Resp. to Allegedly Undisputed Material Facts in Supp. of Operation Bass, Inc.'s Mot. for Summ. J., Aug. 10, 2017, ECF No. 110 [hereinafter "Pl.'s First Statement of Facts"]; Resp. to Allegedly Undisputed Material Facts in Supp. of Shinichi Fukae's Mot. for Summ. J., Aug. 11, 2017, ECF No. 111 [hereinafter "Pl.'s Second Statement of Facts"]; Resp. to Statement of Uncontested Facts by Fishing Holdings, Aug. 14, 2017, ECF No. 114 [hereinafter "Pl.'s Third Statement of Facts"]; Gulley Resp. to Statement of Allegedly Undisputed Material Facts Made in Support of Operation Bass, Inc.'s Mot. for Summ. J. on Claims for Knee and Neck Injuries, Aug. 16, 2017, ECF No. 117 [hereinafter "Pl.'s Fourth Statement of Facts."]; Corrected (Re Allegation #7) Resp. to Allegedly Undisputed Material Facts in Supp. of Shinichi Fukae's Mot. for Summ. J., Aug. 16, 2017, ECF No. 119 [hereinafter "Pl.'s Corrected Second Statement of Facts"]. While each series of competing statements of facts arises in the context of each Defendant's Motion—that is to say, the particular Defendant's statement of facts as marshalled against

Plaintiff's particular statement of facts in response—Defendants have had ample time to review and dispute any of their co-defendants' statements of the facts or a statement made by Plaintiff against their co-defendants.  All of the statements of facts have been available to all parties since August if not before.

### 1.      The Accident

On June 19, 2011, the final day of a professional bass fishing tournament, a bass boat piloted by Fukae and carrying Plaintiff allided[2] with a bridge, sparking this litigation.  Operation Bass, doing business as Fishing League Worldwide ("FLW"), put on the particular tournament. During FLW tournaments, if a fisherman has "made the cut" to the latter portion of the tournament and is thus eligible to compete on either Saturday or Sunday, the fisherman is required to use an Operation Bass fishing boat.  Operation Bass had leased all of its fishing boats from Fishing Holdings for the Saturday and Sunday of the particular tournament from which this case arose.  On the Sundays of the 2011 tournaments, there would be ten fishermen participating. Each fisherman would be accompanied by a cameraman and using the fishing boats and outboard motors Operation Bass had leased from Fishing Holdings.   Once the fisherman arrived at a fishing site, he was allowed under FLW rules to stow the pedestal seat that was provided with each boat in the storage containers on the particular fishing boat.  At the end of each fishing season, Operation Bass returned the fishing boats to Fishing Holdings.

Fukae, one of the professional fishermen participating in the June 2011 FLW tournament, and Plaintiff, the cameraman assigned to Fukae, were both on a 2011 Ranger Z520 20' 9" bass boat (the "Boat") in Kentucky Lake in Henry County, Tennessee.   Fukae was aware that

---

[2] *See infra* note 21.

Operation Bass employed Plaintiff and that Plaintiff had no dealings with Fishing Holdings. The Boat was one of the Operation Bass fishing boats leased from Fishing Holdings. At approximately 1:30 P.M., Fukae decided to try one last fishing stop before the tournament's final weigh-in and drove the Boat north. But before doing so, he removed the forward pedestal seat and laid it on the deck between the operator's console and the passenger's console. Fukae has fished out of Ranger boats since 2004 and was familiar with the Boat. Fukae has also confirmed that there was a space on the Boat in which to stow the pedestal seat. Fukae utilized the Boat's hand throttle to control whether the Boat moved forward or in reverse, as well as the speed of the propeller. As the Boat accelerated, the pedestal seat began to bounce and roll. Fukae attempted to secure the pedestal seat with his foot but was unsuccessful. Distracted by the pedestal seat during the Boat's approach, Fukae then looked up to see the Highway 79 Bridge (the "Bridge") in front of him. The Boat struck the Bridge, throwing Plaintiff into the operator's console. As a result of the impact, Plaintiff claims to have sustained nine broken ribs, a punctured left lung, a ruptured liver, a gash on the head, at least an aggravation of the torn ACL in his right knee, and an injured or re-injured neck.

### 2. The Boat

Plaintiff has admitted that the Boat, as it was outfitted at the time of the accident, was not unsafe, but Plaintiff believes that the boat could have been made safer with a "hot foot" device.[3] A hot foot device is a foot control throttle in a bass boat that resembles a gas pedal. The driver of the boat pushes down on the device to go faster and lets up on the device to go slower. A hot

---

[3] Plaintiff believes that the lack of the hotfoot device and Fukae's failure to secure the pedestal seat both contributed to his injury. Pl.'s First Statement of Facts, ¶¶ 3, 4 (citing Excerpt of Pl.'s Dep., 427:5–11, Jan. 29, 2016, ECF No. 110-8).

foot device only controls the speed of the boat. If a bass boat does not have a hot foot device, then the speed of the boat is controlled by a hand throttle, which also puts the boat in gear. On a boat with a hand throttle—such as the Boat—there is no reason for the driver to have his hand on the throttle once the boat is up to speed. The only time the driver would need to put his hand back on the throttle would be if he wanted to speed up or slow down. Operation Bass had been using Ranger Boats since 1979. At no point prior to and including the date of the incident had Operation Bass ever leased a boat from Fishing Holdings that was equipped with a hot foot device. Indeed, Ranger Boats does not offer a hot foot device as a standard feature in any of the thousands of bass boats it sells each year. Fukae does not believe that the lack of a hot foot device had anything to do with his collision with the Bridge. From the time that the boat was up on plane[4] until the time of the incident, Fukae never slowed the boat down and both of his hands were on the steering wheel. William B. Taylor was the Senior Director of Tournament Operations for Operation Bass at the time of the incident. Taylor essentially oversees the FLW Tour. Taylor believes that Ranger boats are the best boats on the market. Taylor also believes that the hot foot device has nothing to do with the overall safety of the vessel but is simply a preference of some fishermen. According to Taylor, Operation Bass has previously discussed the issue of safety and hot foot devices but concluded that such devices have no impact on safety.

Taylor also stated that the Boat had substantial storage space at the time of the incident and that the pedestal seat could be stored in one of three ways: in the well between the passenger and the driver, as was done on the day of the incident; wedged in area designed for the seat to be pushed into; and in the storage area where it is normally stored during travel. The parties agree

---

[4] A boat is up on plane when it "skim[s] over the surface of water as a result of lift produced hydrodynamically." Plane, *New Oxford American Dictionary* (3d ed. 2010).

that no equipment was necessary to secure the pedestal seat that the Boat did not have at the time of the accident. Overall, Plaintiff believes that Ranger makes a very good boat and, in fact, has stated that the only two bass boats he has ever owned were Ranger boats. Fukae also believes that Ranger makes a very safe boat and had no complaints about the design or performance of the Boat. Plaintiff has admitted that he only blames Fukae for failing to secure the pedestal seat and not any of the other Defendants.

Plaintiff also believes that additional factors beyond the relative safeness of the Boat contributed to his injury: (1) the roughness or choppiness of the water that Fukae and Plaintiff were sent out into during the tournament;[5] (2) all contestants in the tournament were required to fish out of a tournament boat, which meant that some may have been operating equipment they were not familiar with; and (3) contestants were prohibited from removing any equipment from the tournament boat, which caused unnecessary pressure and stress on the contestants because they (a) had to load all their equipment in a limited amount of time and (b) there was no room to store the pedestal seat in a storage compartment on the boat, allowing it to bounce around and distract Fukae. Fukae, however, had fished out of tournament boats many times prior to the incident at issue, and there was nothing about the tournament boat that he was operating at the time of the incident that was new or otherwise unfamiliar to him. Fukae knew how much storage space he had on the Boat and how much equipment he could bring that could be stored. In short,

---

[5] Plaintiff maintains that Operation Bass sent him out on the fishing boat in bad weather conditions. Operation Bass disputes this belief, stating that bad weather conditions had nothing to do with the accident because it was not even raining at that time, visibility was clear, and Fukae had no problem seeing the bridge. Operation Bass's First Statement of Facts, ¶ 3. Plaintiff, however, disputes this statement by referencing his own deposition and a statement made by Fukae, both of which support Plaintiff's position to the degree that the water was rough and "choppy." Pl.'s First Statement of Facts, ¶ 3 (citing TWRA Statement Form, June 19, 2011, ECF No. 110-17; Excerpts of Pl.'s Dep., 367:14–368:1, Jan. 29, 2016, ECF Nos. 110-2 & 110-3). In this particular statement at least, Operation Bass fails to muster any supporting evidence as to the weather.

there is no evidence that Fukae's familiarity or lack thereof with the Boat had any effect on whether Fukae was watching where he was going.   Nor is there any evidence that any pressure or stress Fukae may have experienced by moving his equipment contributed to him not watching where he was going.

### 3.    Plaintiff

After the incident, Plaintiff worked for Operation Bass as a camera boat operator and as a co-angler during the fishing tournament seasons of 2012 and 2013.  But since at least the date of the incident, Plaintiff has had no monthly living expenses because he has lived with his mother, who has paid for everything.  Plaintiff is now 51 years old, unemployed, and not looking for a job.

In September 1997, Plaintiff injured his right knee playing football and had an MRI performed that showed he had a torn ACL in his right knee.  Plaintiff has never had this torn ACL repaired, so it was still torn at the time of the accident.  Plaintiff's right knee began hurting in February or March 2012.  Dr. Mitchell Massey, a board-certified orthopedic surgeon, who saw Plaintiff in October 2013 when Plaintiff was complaining of right knee pain, examined Plaintiff's knee as it was then and also reviewed the report from Plaintiff's 1997 MRI.   Dr. Massey concluded that this was basically the same injury and noted that a torn ACL that goes untreated for too long will result in an arthritic knee.  No doctor has told Plaintiff that his right knee was injured in the accident or that his problems were otherwise caused by the accident.

In 2003, Plaintiff had cervical fusion surgery.  Plaintiff claims he re-injured his neck in

the accident, but the precise time when he began having problems with his neck is disputed.[6]  Dr. Steven Brooks is a board-certified surgeon who saw Plaintiff at Vanderbilt University Hospital on December 3, 2012.  Plaintiff went to see Dr. Brooks because he had questions concerning his June 2011 surgery and other issues with workers compensation.  Dr. Brooks conducted a physical examination of Plaintiff, including a musculoskeletal examination and a neurological examination, both of which showed no injury or other abnormality.  Plaintiff was complaining of tingling in his hands and right knee pain but admitted to Dr. Brooks that those symptoms did not begin until seven to eight months after his injury.[7]  It was Dr. Brooks's opinion that those symptoms were unrelated to the trauma that had necessitated the June 2011 surgery.  A CT scan of Plaintiff's head and spine in June 2011 showed no evidence of a cervical spine injury.[8]

All of Plaintiff's medical expenses—with the exception of the expenses for doctor visits for Plaintiff's problems with his right knee—were paid by Operation Bass's workers compensation carrier, Intervenor Plaintiff The Hartford Insurance Company ("Hartford").[9]

_____

[6] *See* Operation Bass's Second Statement of Facts, ¶ 3 (citing Dep. of Robert Gulley, 139:6–140:16, Jan. 28, 2016, ECF No. 96-3); Pl.'s Fourth Statement of Facts, ¶ 3 (citing Untitled Document, at 93, Sept. 13, 2011, ECF No. 117-2).

[7] Plaintiff disputes only to add that he complained of new neck symptoms three months after the accidents.  Pl.'s Fourth Statement of Facts, ¶ 15 (citing Untitled Document, at 93, Sept. 13, 2011, ECF No. 117-2).

[8] Plaintiff disputes this statement to the extent that it suggests a CT scan would show less obvious signs of injury to the ligaments, muscles, or intervertebral discs.

[9] Plaintiff does not dispute this statement but finds additional facts necessary to its consideration:  Hartford and Operation Bass said they would refuse to pay for medical treatment of Plaintiff's knee or neck and further refused to pre-approve medical consultation that could have diagnosed and treated Plaintiff's aggravated neck and knee injuries.  Pl.'s First Statement of Facts, ¶ 23 (citing Untitled Document, at 93, Sept. 13, 2011, ECF No. 110-25; Excerpts of Pl.'s Dep., 147:12–16, 393:7–12, 404:6–10, 406:15–407:1, Jan. 29, 2016, ECF Nos. 110-4, 110-5, 110-6, 110-7, & 110-10); Excerpts of Beth Houdek's Dep., 17:1–21:25, May 8, 2017, ECF Nos. 110-18, 110-19, 110-20, 110-21, & 110-22; Excerpts of Jim Moss's Dep., 20:22–21:14, ECF Nos. 110-23 & 110-24).

Plaintiff was paid approximately $1,066.68 per month in workers compensation temporary total disability benefits by Hartford during the periods of time when his doctors said he should not be working. Hartford issued a workers compensation insurance policy with Operation Bass as a named insured. Plaintiff made a workers compensation claim under that policy for the injuries he sustained in the accident.[10] Hartford then paid workers compensation benefits to Plaintiff and his healthcare providers in connection with his workers compensation claim. Hartford paid Plaintiff $13,104.93 in temporary total disability benefits in connection with his workers compensation claim. The total, undiscounted charges for Plaintiff's medical treatment allegedly incurred as a result of the accident are $272,806.06. Hartford paid $165,558.92 in medical bills in connection with Plaintiff's workers compensation claim. Hartford paid all of the medical bills that it received in connection with Plaintiff's workers compensation claim except for two bills from the Tupelo Orthopedic Clinic dated October 7, 2013, and October 9, 2013, in the amount of $207.00 each for treatment of Plaintiff's right knee. Hartford did not pay these two bills based on medical evidence—in the form of the Tupelo Orthopedic Clinic's office notes for these two visits, as well as a medical record dated December 3, 2012, from Dr. Steven Brooks at Vanderbilt University Hospital—that indicated Plaintiff's right knee injury was not related to his workers compensation claim. Prior to treatment by Dr. Brooks and Dr. Massey, Gulley had

---

[10] Plaintiff disputes that he filed a workers compensation claim, arguing that Operation Bass made the decision to unilaterally treat this claim as a workers compensation matter in order to avoid liability under the Jones Act and general maritime law. No party cites any evidence in support of their position. Fortunately for Operation Bass, the page of Beth Houdek's Deposition that it cites in paragraph 26 of its First Statement of Facts also supports this statement. Operation Bass's First Statement of the Facts, ¶¶ 25–26 (citing Dep. of Beth Houdek, 8:22–25, May 8, 2017, ECF No. 95-6); Dep. of Beth Houdek, 8:18–21, ECF No. 95-6 ("Q. Did Robert Gullley make a workers' compensation claim under that policy for an injury that occurred on or about June 19, 2011? A. Yes."); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

requested that Hartford authorize medical treatment for his right knee in connection with his workers compensation claim. Hartford denied Plaintiff's request because there was no medical evidence relating the knee injury to the 2011 injury that was the subject of Plaintiff's workers compensation claim.

Plaintiff is now claiming damages for reasonable medical expenses incurred as well as for future medical expenses. Four physicians have testified as to Plaintiff's injuries and medical treatment.[11] And while Defendants and Hartford have stipulated that the amount actually paid for Plaintiff's *past* medical expenses was necessary and reasonable, Stipulation of the Parties as to the Reasonableness and Necessity of Medical Expenses, at 2, Oct. 23, 2017, ECF No. 139 [hereinafter "Stipulation"], no doctor has testified that any *future* medical expenses would be reasonable or necessary.

### B. Procedural Background

On June 17, 2014, Plaintiff filed his Complaint (ECF No. 4),[12] seeking damages for negligence under the Jones Act, unseaworthiness, and maintenance and cure, as well as negligence with respect to Fukae under general maritime law. Defendants filed their respective Answers to the Amended Complaint in September 2014 (ECF Nos. 15, 16, & 17). Around that time, Operation Bass filed its Verified Complaint for Exoneration from or Limitation of Liability

---

[11] While Plaintiff does not dispute this statement as written, Plaintiff believes additional facts are relevant to its consideration: specifically, all Defendants were served with an itemized copy of Plaintiff's medical, hospital, and doctor bills at the deposition of Beth Houdek on May 8, 2017, which was well in advance of the 90-day notice requirement set forth in section 24-5-113(b)(1) of the Tennessee Code Annotated. Pl.'s Second Statement of Facts, ¶ 6 (citing Ex. 3 to the Dep. of Beth Houdek, May 8, 2017, ECF No. 111-2).

[12] Plaintiff's Complaint appears as ECF No. 4 in Case No. 1:14-cv-01138-STA-egb.

(ECF No. 1) as owner *pro hoc vice* of the Boat pursuant to the Limitation of Vessel Owner's Liability Act, 46 U.S.C. § 30501 *et seq*. This Verified Complaint opened a separate case that is now the lead case in this consolidated matter. Plaintiff filed an Answer (ECF No. 9) on October 15, 2014, to Operation Bass's Verified Complaint. On December 11, 2014, Plaintiff filed a claim for damages against the Boat (ECF No. 16). The next day, Fishing Holdings filed its own Verified Complaint for Exoneration from or Limitation of Liability (ECF No. 1)[13] as actual owner of the Boat pursuant to the Limitation of Vessel Owner's Liability Act. The filing opened the third and final case that is now a part of this consolidated matter. In January 2015, Operation Bass filed a Third Party Complaint against Fukae and Fishing Holdings (ECF No. 19), asserting any injury caused to Plaintiff was their fault rather than that of Operation Bass. In March, Fukae and Fishing Holdings both filed respective Answers to Operation Bass's Third Party Complaint (ECF Nos. 21 and 24). In Fishing Holdings's Answer, it asserted claims against Operation Bass, to which Operation Bass filed its own Answer (ECF No. 25). Plaintiff and Operation Bass filed Answers to Fishing Holdings's Verified Complaint (ECF Nos. 15 & 17)[14] in April and May 2015. Then Fishing Holdings moved the Court to consolidate the two limitation-of-liability cases (ECF No. 29). The Court granted that Motion in its May 18, 2015 Order (ECF No. 35), and, with the related case pursued by Plaintiff, all three cases have proceeded together.

On April 4, 2017, Hartford filed its first Motion to Intervene (ECF No. 75). It filed an Amended Motion to Intervene (ECF No. 77) the next week. And then in June, Defendants filed

---

[13] Fishing Holdings's Verified Complaint appears as ECF No. 1 in Case No. 1:14-cv-02976-STA-egb.

[14] Operation Bass's Answer to Fishing Holdings's Verified Complaint appears at ECF No. 15 in Case No. 1:14-cv-02976-STA-egb. Plaintiff's Answer to Fishing Holdings's Verified Complaint appears at ECF No. 17 of the same.

the Motions now before the Court. Specifically, Fishing Holdings has filed a Motion for Summary Judgment (ECF No. 91);[15] Fukae has filed a Motion for Partial Summary Judgment on Plaintiff's Claim for Medical Expenses (ECF No. 94); and Operation Bass has filed both a Motion for Summary Judgment (ECF No. 95) and a Motion for Partial Summary Judgment on Claims for Knee and Neck Injuries (ECF No. 96). Fishing Holdings has joined in both Motions for Partial Summary Judgment (ECF Nos. 99, 100, & 108). Fukae has joined in Operation Bass's Motion for Partial Summary Judgment (ECF Nos. 102 & 108). Plaintiff Robert Gulley has filed a Response to Operation Bass's and Fishing Holding's Motions for Summary Judgment (ECF Nos. 110 & 114), a Response to Fukae's Motion for Partial Summary Judgment (ECF No. 111), and a Response in Opposition to Operation Bass's Motion for Partial Summary Judgment (ECF No. 117). Thereafter, Operation Bass filed a Reply to Plaintiff's Response to its Motion for Summary Judgment (ECF No. 124) and a Reply to Plaintiff's Response to its Motion for Partial Summary Judgment (ECF No. 132). Fukae filed a Reply to Plaintiff's Response to his Motion for Partial Summary Judgment (ECF No. 125) and a Reply to Plaintiff's Response to Operation Bass's Motion for Partial Summary Judgment (ECF No. 131). Fishing Holdings filed a Reply to Plaintiff's Response to its Motion for Summary Judgment (ECF No. 126). On August 31, 2017, the Court granted Hartford's Amended Motion and permitted it to intervene in this consolidated matter (ECF No. 133). On September 29, 2017, the Court reopened discovery for the limited purpose of medical proof (ECF No. 138), so that Hartford could respond to Fukae's Motion for Partial Summary Judgment. Hartford did so in its October 23, 2017 Response (ECF No. 140).

---

[15] ECF numbers are provided from the lead case, No. 1:14-cv-01226-STA-egb, unless otherwise noted.

## II.    LEGAL STANDARD

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56.  When deciding a motion for summary judgment, the Court must review all the evidence, viewing it in a light most favorable to the nonmoving party and also drawing all reasonable inferences in that party's favor.  *Roell v. Hamilton Cty.*, 870 F.3d 471, 479 (6th Cir. 2017) (citing *Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016)); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court "may not make credibility determinations []or weigh the evidence." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).  "The burden is generally on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by 'showing . . . that there is an absence of evidence to support the nonmoving party's case.'"  *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but instead must present some "specific facts showing that there is a genuine issue for trial."  *Celotex Corp.*, 477 U.S. at 324; *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014).  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict in his favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The Court must, however, enter summary judgment "against a party who fails to . . . [meet the burden] that party will bear . . . at trial." *Celotex Corp*, 477 U.S. at 322.

# III.    ANALYSIS

## A.    The Issues Raised by Defendants' Motions

At the outset, the Court will determine each issue raised by the parties' Motions, Responses, and Replies so that the Court may identify any common issues and analyze the parties' arguments together rather than analyze each Motion issue-by-issue in isolation from the other parties.   The Court believes that this method not only will result in the most thorough examination of the issues but also allow for greater judicial efficiency.

Plaintiff's Amended Complaint contains four counts.   Count I sets forth Plaintiff's claim for negligence under the Jones Act against Operation Bass and Fishing Holdings.   Count II sets forth Plaintiff's claim of unseaworthiness against Operation Bass and Fishing Holdings.   Count III sets forth Plaintiff's claim of maintenance and cure against Operation Bass and Fishing Holdings.   Count IV sets forth Plaintiff's claim for negligence against Fukae under general maritime law.   Operation Bass, in its Motion for Summary Judgment, argues that all of the acts of negligence or unseaworthiness involving Operation Bass had nothing to do with causing the allision.   Operation Bass further argues that Plaintiff is not entitled to maintenance and cure, but if he were, the workers compensation he received from Hartford surpassed anything he would be owed.   Fishing Holdings argues in its own Motion that Plaintiff has raised no act of Fishing Holdings that constituted a breach of duty under the Jones Act, general maritime law, or even Tennessee common law, or otherwise rendered the Boat unseaworthy.   In his Motion for Partial Summary Judgment, Fukae argues that Plaintiff has failed to produce any evidence that past or future medical expenses were necessary, limiting Plaintiff's recovery to the medical expenses actually paid to providers for Plaintiff's medical care.   In its own Motion for Partial Summary

Judgment, Operation Bass argues that Plaintiff has failed to produce any evidence that supports a causal connection between the accident and Plaintiff's knee and neck injuries.

The issues for the Court's consideration are therefore stated as such: (1) Whether either Operation Bass or Fishing Holdings can be held liable for negligence under the Jones Act or otherwise under general maritime law; (2) whether any act or omission of Operation Bass or Fishing Holdings resulted in the Boat being unseaworthy on the date of the accident; (3) whether Plaintiff is entitled to maintenance and cure from Operation Bass and Fishing Holdings; (4) whether Plaintiff has any evidence supporting the reasonableness and necessity of past medical expenses or future medical expenses; and (5) whether Plaintiff has any evidence that his neck and knee injuries were caused or aggravated by the accident. The Court will address each of these issues in turn.

### B.      Negligence of Operation Bass or Fishing Holdings

Operation Bass and Fishing Holdings both argue that they are entitled to summary judgment on Plaintiff's Jones Act negligence claims because there is no dispute as to any material fact and those facts fail to support a claim for negligence. Plaintiff argues that Operation Bass and Fishing Holdings are liable for their failure to provide a reasonably safe vessel. Neither Operation Bass nor Fishing Holdings, however, may be held liable for negligence under the Jones Act because Operation Bass did not a breach any duty it owed to Plaintiff and Fishing Holdings cannot be held liable under the Jones Act because it was not Plaintiff's employer.

"It is a well-settled principle of law that seamen are 'emphatically the wards of the admiralty.'"[16]  *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 597 (6th Cir. 2001) (quoting *Chrandis, Inc. v. Latsis*, 515 U.S. 347, 354–55 (1995)).  This principle is reflected in a remedial provision of the Jones Act that provides:  "A seaman injured in the course of employment . . . may elect to bring a civil action at law . . . against the employer.  *Laws of the United States regulating recovery for personal injury to . . . a railway employee apply to an action under this section*."  46 U.S.C. § 30104 (emphasis added).  The second sentence is significant because it means that the seaman's employer is liable for injuries it may have only partially or even slightly caused.  *See Perkins*, 246 F.3d at 598 (citing 45 U.S.C. § 51 *et seq.*).  "Therefore, in suits under the Jones Act, the [C]ourt must determine whether the evidence justifies the conclusion that the employer was negligent and that the employer's negligence played any part, however slight, in producing the injury to the seaman."  *Id.* (citing *Sweeney v. Am. Steamship Co.*, 491 F.2d 1085, 1089 (6th Cir. 1974)).  This means that, while negligence is determined under the ordinary standard of a reasonable, prudent person, there is a reduced requirement for the degree of causation between the employer's negligence and the seaman's injury necessary to impose liability.  *Taylor v. Teco Barge Line, Inc.*, 517 F.3d 372, 383 (6th Cir. 2008) (citations omitted); *Rutherford v. Lake Mich. Contrs., Inc.*, 28 F. App'x 395, 397 (6th Cir. 2002) (citing *Perkins*, 246 F.3d at 598–99).  Nonetheless, Plaintiff must still first establish that

---

[16] The reason for this of course is the harsh nature of the work that exposes them to "the perils of the sea."  *Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548, 554–55 (1997) (quoting *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995)).  While lakes are undoubtedly within the grant of admiralty jurisdiction to the federal courts, *Propeller Genesee Chief v. Fitzhugh*, 53 U.S. 443, 457 (1852), the Court has some question of whether a cameraman on a bass boat for a fishing tournament constitutes a seaman within the meaning of the Jones Act.  Plaintiff, however, has alleged a number of facts in his Amended Complaint aimed to qualify him as such and maintains that he clearly qualifies as a Jones Act seaman in his memoranda.  But decisively for the purposes of the instant Motions, no Defendant has challenged his status as a seaman in their arguments to the Court.

his employer owed him a duty and then breached that duty. *Taylor*, 517 F.3d at 383 (quoting *Perkins*, 246 F.3d at 598).

Additionally, the plain language of the Jones Act expressly limits its applicability to actions against an employer. *Guidry v. S. La. Contractors, Inc.*, 614 F.2d 447, 452 (5th Cir. 1980) (quoting *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 224 (5th Cir. 1975)); *see also Wilkes v. Miss. River Sand & Gravel Co.*, 202 F.2d 383, 388 (6th Cir. 1953) (referring to "the employee-employer relationship required by the Jones Act"). As it is undisputed that Operation Bass, and not Fishing Holdings, employed Plaintiff, Fishing Holdings cannot be held liable under the Jones Act. Fishing Holdings is therefore entitled to judgment as a matter of law on Plaintiff's Jones Act claim against it.[17] Count I of Plaintiff's Amended Complaint, as it applies to Fishing Holdings, is therefore **DISMISSED**.

Operation Bass broadly argues that the undisputed proof shows that the bases for Plaintiff's negligence claim under the Jones Act either never occurred or had nothing to do with causing Plaintiff's injuries. Plaintiff makes two[18] arguments in his Response as to why Operation Bass was negligent. First, Plaintiff argues that Operation Bass is responsible for Taylor's negligence in instructing Fukae to place the pedestal seat in the boat, which in turn distracted Fukae and caused Plaintiff's injuries. *See* Pl.'s Resp. to Mots. for Summ. J., at 3.

---

[17] Plaintiff appears to acknowledge this in his combined Response to both Operation Bass's and Fishing Holdings's Memoranda in Support of their respective Motions for Summary Judgment, in which he argues that both Operation Bass and Fishing Holdings are liable for unseaworthiness but only mentions Operation Bass as being liable under the Jones Act. Robert Gulley's Memorandum in Resp. to Operation Bass and Fishing Holdings Memoranda Supp'g Their Mots. for Summ. J., at 2–3, Aug. 14, 2017, ECF No. 114-1 [hereinafter "Pl.'s Resp. to Mots. for Summ. J."].

[18] Of the four bases for Plaintiff's claims of negligence and unseaworthiness, the weather and the stress of the fishermen mentioned in the statements of facts because of the pedestal seat are only collaterally referenced by other arguments in Plaintiff's memoranda.

Second, Plaintiff argues that the omission of a hot foot device on the vessel constituted negligence, and, because Fukae did not have access to such a device to prevent the allision, such an omission caused Plaintiff's injuries. *See id.* at 6. The Court finds, however, that neither basis sustains a claim of negligence under the Jones Act against Operation Bass in light of the undisputed facts of this case.

Plaintiff argues that Operation Bass is responsible for Taylor's negligence in instructing Fukae to place the pedestal seat in the boat because the pedestal seat distracted Fukae while piloting the Boat, resulting in Plaintiff's injuries. Plaintiff does not dispute that the Boat contained ample storage space for the pedestal seat or that Fukae knew how much storage space the boat had. Pl.'s First Statement of Facts, ¶ 15; Pl.'s Third Statement of Facts, ¶ 10. Plaintiff does not dispute that the Boat was equipped at the time of the accident with all the equipment necessary to restrain the pedestal seat. Pl.'s First Statement of Facts, ¶ 12. In fact, Plaintiff admitted that he only blames Fukae for failing to secure the pedestal seat. *Id.* at ¶ 11. If the parties are in agreement that the Boat contained ample storage space for the pedestal seat so that it was not bouncing around on the Boat, this fact was known, and Plaintiff only thinks the pilot of the Boat is responsible, then there is not sufficient evidence that Operation Bass was negligent in its provision of the Boat to Fukae.

Plaintiff asserts, and Operation Bass does not dispute, that Operation Bass had a duty to provide a reasonably safe vessel for him to work. The parties disagree on whether the failure to include a hot foot device breached that duty. Yet Plaintiff admits that the Boat was not unsafe at the time of the accident. Pl.'s First Statement of Facts, ¶ 20. And if the Boat was reasonably safe, Operation Bass cannot be found to have negligently provided the Boat. Plaintiff nonetheless contends that his own testimony that the hot foot device would have made the boat

safer is sufficient to present a factual dispute for trial because of the "featherweight" burden of proving negligence. Pl.'s Resp. to Mots. for Summ. J., at 6 (quoting *Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898 (6th Cir. 2006)). But assuming *arguendo* that Operation Bass was negligent in doing so, the undisputed facts overwhelmingly show that Fukae had the means to do exactly what the hotfoot device would have let him do. Yet the allision still occurred. Plaintiff does not dispute that a hot foot device functions like a gas pedal in that pushing down on the pedal increases the speed of the boat. Pl.'s First Statement of Facts, ¶ 4. Without a hot foot device, the speed of the boat is controlled by the hand throttle. *Id.* Plaintiff does not dispute that the pilot of the boat would only have his hand on the throttle to speed up or slow down. *Id.* at ¶ 5. Nor does Plaintiff dispute that Fukae had both hands on the steering wheel from the moment the boat was upon plane until the allision with the bridge and never slowed down. *Id.* at ¶¶ 6–7. There is no indication that the Boat turned before it allided with the Bridge. Thus, Plaintiff cannot even demonstrate slight causation because there is no evidence that the omission of the hot foot device contributed to the allision even if it would have made the Boat generally safer.

Because Operation Bass was not negligent in requiring Fukae to take the pedestal seat on the Boat or in not using a boat with a hot foot device—and even if it was negligent in omitting the hot foot device, the omission did not contribute to the allision, the Court finds that the undisputed facts of this case show that Plaintiff cannot sustain a claim of negligence under the Jones Act against Operation Bass. Operation Bass is therefore entitled to summary judgment on that claim. Count I of Plaintiff's Amended Complaint, as it applies to Operation Bass, is therefore **DISMISSED**. As all claims under Count I have been dismissed, Count I of Plaintiff's Amended Complaint is **DISMISSED** in its entirety.

C.      **Seaworthiness of the Boat**

Operation Bass and Fishing Holdings argue that, because Plaintiff admits the Boat was safe, the undisputed facts show that the Boat was seaworthy, and therefore Plaintiff cannot prevail on a claim for unseaworthiness. Plaintiff responds that Operation Bass and Fishing Holdings are liable for the unseaworthy condition of the Boat that was created by the loose pedestal seat and the omission of a hot foot device. And Plaintiff alternatively relies on maritime law presumptions of fault as the basis for this claim. The Court is not persuaded by Plaintiff's arguments and finds that, based on the undisputed facts before it, the Boat was seaworthy at the time of the accident.

Plaintiff contends that the provision of the Boat with a loose pedestal seat but without a hot foot device constituted the provision of an unseaworthy vessel. The doctrine of seaworthiness requires the vessel's owner[19] to provide the crew with a ship that is reasonably fit for its intended purpose. *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441 (2001) (citing *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960)); *Crumady v. The Joachim*, 358 U.S. 423, 431 (1959) (Harlan, J., dissenting); *Rutherford v. Lake Mich. Contrs., Inc.*, 28 F. App'x 395, 400 (6th Cir. 2002).

> [T]he owner is [not] obligated to furnish an accident-free ship. The duty [to provide a seaworthy ship] is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service.

---

[19] Having leased the Boat from Fishing Holdings, Operation Bass is considered the owner *pro hoc vice* of the Boat and therefore has the same duty to provide a seaworthy vessel as an owner. *McAleer v. Smith*, 57 F.3d 109, 112 (1st Cir. 1995) (citing *Reed v. S.S. Yaka*, 373 U.S. 410, 412–13 (1963)) (stating that "an owner *pro hoc vice* may be liable for the unseaworthiness of a vessel"); *cf. Brandon v. Owensboro Harbor Serv.*, 1998 U.S. App. LEXIS 9783, at *10 (6th Cir. May 11, 1998) (finding that an entity that was not the owner *pro hoc vice* had no duty to make a barge seaworthy).

*Italia Societa per Azioni di Navigazione v. Or. Stevedoring Co.*, 376 U.S. 315, 322 (1964) (quoting *Mitchell*, 362 U.S. at 350); *see also Rutherford*, 28 F. App'x at 400 (citations omitted) ("Under the seaworthiness doctrine, there is an absolute duty to maintain a seaworthy ship, the breach of which imposes liability without fault. The ship owner is not required, however, to furnish an accident-free ship."); *Kenn v. Overseas Tankship Corp.*, 194 F.2d 515, 518 (2d Cir. 1952) ("The warranty of seaworthiness as to hull and gear has never meant that the ship shall withstand every violence of wind [but shall be] reasonably fit for the voyage in question."). The Court discussed above why the provision of the pedestal seat and omission of a hot foot device did not render the Boat unsafe. The same is true here, and the Court will not repeat its analysis. Neither Operation Bass nor Fishing Holdings can be liable for providing an unseaworthy vessel when neither the inclusion of a pedestal seat nor the omission of a hot foot device rendered the Boat unfit to be safely used in a professional fishing tournament. As Plaintiff has admitted, the fault, at least for the purposes of these Motions and if there is any fault, lies with Fukae as pilot of the Boat. While many things might create a condition of unseaworthiness, an individual's act of negligence, without some condition of the vessel that rendered it unfit for its purpose, is not one of them.[20] *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499–500 (1971). The Court therefore finds that neither the required inclusion of the pedestal seat onboard the Boat or the lack of a hot foot device constituted a condition of unseaworthiness.

---

[20] If Fukae lacked the competency to pilot the Boat, the Court would be faced with different circumstances as to whether Plaintiff was provided a seaworthy ship. But nothing in the record suggests that Fukae, an experienced professional fisherman who was familiar with bass boats of the same type as the Boat, lacked such competency.

Plaintiff then raises the *Oregon* Rule. In *The Oregon*, the Supreme Court established a rebuttable presumption that, when a vessel allides[21] with a stationary object, the vessel is at fault. *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 362 (6th Cir. 2010) (citing *The Oregon*, 158 U.S. 186, 197 (1895)). But despite the fact that this case involves a vessel alliding with a stationary object, the *Oregon* Rule does not apply. "Not unlike the doctrine of *res ipsa loquitur*, the *Oregon* Rule creates a *prima facie* case of negligence, not a final case of sole negligence." *Id.* (citations omitted). The Rule is "[b]ased on the common-sense observation that moving vessels do not usually allide with stationary objects unless the vessel is mishandled in some way, . . . . [b]ut when the parties have introduced evidence to dispel the mysteries that gave rise to the presumption, the *Oregon* Rule has no factual void to fill." *Id.* (quoting *In re Mid-South Towing Co.*, 418 F.3d 526, 532 n.6 (5th Cir. 2005)); *City of Chicago v. M/V Morgan*, 375 F.3d 563, 572 (7th Cir. 2004) (internal quotation marks omitted). Here, the undisputed facts show quite clearly what occurred: Fukae was distracted and did not see the Bridge as a result. Therefore, the Court finds that the *Oregon* Rule is inapplicable to the facts of this case. As noted by Operation Bass in its Reply, the *Oregon* Rule would be inapplicable to this case even if a mystery as to what occurred persisted because the *Oregon* Rule is applied to cases where the dispute is over the allocation of fault between the vessel and the stationary object. *See generally Mitchell v. Trawler Racer, Inc.*, 263 U.S. 359 (1960); *Mahnich v. Southern S.S. Co.*, 321 U.S. 96 (1944).

---

[21] In his Response to Operation Bass's and Fishing Holdings's Motions for Summary Judgment, Plaintiff recited the Sixth Circuit's recent, at least in terms of maritime law, delineation of allision and collision (as well as elision): "an allision occurs when a moving vessel strikes a stationary object, and a collision occurs when two moving vessels strike each other. (An elision occurs when lawyers mistakenly lump the two concepts together.)" *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 362 (6th Cir. 2010) (citing *Fischer v. S/Y Neraida*, 508 F.3d 586, 589 n.1 (11th Cir. 2007)).

Plaintiff also raises another rebuttable presumption support of his unseaworthiness claim. Because Operation Bass has argued that the weather was favorable on the day of the accident, Plaintiff relies on the presumption of unseaworthiness that arises when a vessel sinks in calm waters. *See Underwriters at Lloyd's v. Labarca*, 260 F.3d 3, 8 (1st Cir. 2001) (citing *Pace v. Ins. Co. of North Am.*, 838 F.2d 572, 577 (1st Cir. 1988)). As the First Circuit explained in *Pace*, unseaworthiness is presumed "[i]f a boat sinks in calm seas, *without more*." 838 F.2d at 577 (quoting *Sipowicz v. Wimble*, 370 F. Supp. 442, 448 (S.D.N.Y. 1974)). But here, there is more. The undisputed facts show that the Boat allided with the Bridge because Fukae was distracted by the pedestal seat. Therefore, the presumption described by the First Circuit does not apply. As with the applicability of the *Oregon* Rule, there is no factual void to fill here. Because Plaintiff's arguments are not supported by the undisputed facts of the case or general maritime law, and those facts show that the Boat was reasonably fit for use in a professional bass fishing tournament, Operation Bass and Fishing Holdings are entitled to summary judgment on any claims of unseaworthiness. Accordingly, Count II of Plaintiff's Amended Complaint is **DISMISSED** in its entirety.

### D.  Plaintiff's Entitlement to Maintenance and Cure

Operation Bass and Fishing Holdings argue that Plaintiff is not entitled to maintenance and cure when he has no living expenses and he has already received compensation for the medical treatment necessary for the injuries sustained in the accident. Plaintiff asserts that both Operation Bass and Fishing Holdings are strictly liable for maintenance and cure as employer and vessel, respectively. Normally, this is the case. *See Solet v. M/V Capt. H.V. Dufrene*, 303 F. Supp. 980, 988–89 (E.D. La. 1969) (holding that, while maintenance and cure generally arose

from the employer-employee relationship, and thus the employer was personally liable, the liability could also be pursued directly against the vessel).  But Plaintiff admits that he incurs no costs such to require maintenance and that he has already received payments to cover the medical treatment of his injuries caused by the accident such as to satisfy any liability for cure. Therefore, Plaintiff cannot succeed on this claim.

Stemming from centuries old policies that acknowledged the wellbeing of seamen as vital to the nation's economy and security and the peculiar hardships faced by these seamen, maintenance and cure are strict duties that the employer and vessel owner owe any seaman that is injured in service to the vessel.  *See Stevens v. McGinnis, Inc.*, 82 F.3d 1353, 1356–57 (6th Cir. 1996) (citing *Vella v. Ford Motor Co.*, 421 U.S. 1, 3–4 (1975); *Harden v. Gordon*, 11 F. Cas. 480, 483 (Story, Circuit Justice, C.C.D. Me. 1823); Martin J. Norris, *The Law of Seamen* § 26:4 (1985)).  "*Maintenance* refers to a ship owner's obligation to provide a mariner with food and lodging if he becomes injured or falls ill while in service of the ship, while *cure* alludes to the duty to provide necessary medical care and attention."  *Blainey v. Am. S.S. Co.*, 990 F.2d 885, 887 (6th Cir. 1993) (citing *Al-Zawkari v. Am. S.S. Co.*, 871 F.2d 585, 586 n.1 (6th Cir. 1989)) (emphasis added).  Operation Bass correctly points out that a seaman is not entitled to maintenance if he incurs no living expenses.  *See, e.g.*, *Johnson v. United States*, 333 U.S. 45, 50 (1948) (holding that the petitioner was not entitled to maintenance when there was "ample evidence to support the findings of the two lower courts that petitioner had incurred no expense or liability for his care and support at the home of his parents").  The vessel owner, however, is only liable for maintenance and cure until the seaman reaches the point of maximum cure: where the injury is either cured or will no longer improve.  *Blainey*, 990 F.2d at 887 (citing *Farrell v. United States*, 336 U.S. 511, 517–19 (1949)).

Plaintiff has admitted that he has no expenses because he lives with his mother.  Pl.'s First Statement of Facts, ¶ 22.  Indeed, Plaintiff's argument in his Response to Operation Bass and Fishing Holdings' Motions for Summary Judgment is entirely based on cure as it applies to his knee and neck injuries.  The Court accordingly finds that the undisputed facts do not support any liability for maintenance on the part of either Operation Bass or Fishing Holdings and those Defendants are entitled to summary judgment on the issue.

As for cure, Plaintiff admits that his medical expenses were paid by Operation Bass's workers compensation carrier, Hartford.  *Id.* at ¶ 23.  As stated above, the gravamen of Plaintiff's grievance giving rise to this particular claim is that he was not compensated for treatment related to his knee and neck injuries as he was for his other injuries.  But as the Court has found below, there is no evidence that Plaintiff's knee and neck injuries were caused by the accident or otherwise occurred in his employment with Operation Bass or on a vessel owned by Fishing Holdings.  *See infra* Section III.F.  A seaman is only entitled to maintenance and cure when he is injured *in service of the vessel*.  *See Huss v. King Co.*, 338 F.3d 647, 649 n.1 (6th Cir. 2003); *cf. Warren v. United States*, 340 U.S. 523 (1951) (resolving whether the petitioner was in service of the ship such as to be entitled to maintenance and cure).  Therefore neither Operation Bass nor Fishing Holdings can be held liable for the cure of such injuries, and they are entitled to summary judgment on the issue.  As Operation Bass and Fishing Holdings are both entitled to summary judgment on Plaintiff's claims for maintenance and cure, Count III of Plaintiff's Amended Complaint is hereby **DISMISSED** in its entirety.[22]

---

[22] This includes Plaintiff's request for attorneys' fees and punitive damages based on Operation Bass's and Fishing Holdings's failure to pay maintenance and cure, neither of which can be sustained without the underlying claim.

**E. Reasonableness and Necessity of Past and Future Medical Expenses**

Fukae has moved the Court for partial summary judgment on Plaintiff's negligence claim against him, arguing that Plaintiff has failed to prove the reasonableness or necessity of his past or future medical expenses and therefore entitling Fukae to summary judgment on those issues. Generally speaking, a seaman tortuously injured may recover "an award of damages commensurate with the nature and extent of his injuries." *Pfeifer v. Jones & Laughlin Steel Corp.*, 678 F.2d 453, 460 (3d Cir. 1982). A seaman is entitled to recover "for medical expenses reasonably incurred in the past and to be incurred in the future." *Bartholomew v. Universe Tankships, Inc.* 279 F.2d 911, 916 (2d Cir. 1960). But the seaman bears the burden of proof on the necessity of such expenses. *Saleby v. Kingsway Tankers, Inc.*, 531 F. Supp. 879, 884 (S.D.N.Y. 1981). Since the initial filings of memoranda on this Motion, however, Defendants (including Fukae) and Hartford filed a stipulation agreeing that the medical expenses paid by Hartford were reasonable and necessary for Plaintiff's treatment. Stipulation, at 2. Thus, Fukae has conceded that the past medical expenses in connection with the accident were necessary and reasonable, and this particular issue in his Motion is moot. With respect to the future medical expenses, it is undisputed that Plaintiff has produced no evidence that such expenses will be necessary and reasonable. Pl.'s Corrected Second Statement of Facts, ¶ 8. Thus, Plaintiff has failed to meet his burden for claiming future medical expenses, and Fukae is entitled to summary judgment on that issue.

Regarding the past medical expenses that he now agrees were reasonable, Fukae alternatively argues that Plaintiff should be limited to proof of the discounted amount actually paid by Hartford ($165,558.92), thereby excluding the non-discounted amount billed by healthcare providers ($272,806.06). Fukae cites *Koch v. United States*, 2015 U.S. Dist. LEXIS

88610, at *20 (E.D. La. July 7, 2015), and *Tucker v. Cascade General, Inc.*, 2014 U.S. Dist. LEXIS 160265, at *77 (D. Or. Nov. 13, 2014), both of which excluded the non-discounted amount. In his Response, Plaintiff relies on a decision from another member of this Court, *Boettcher v. Shelter Mutual Insurance Co.*, 2016 U.S. Dist. LEXIS 74595, at *6–10, that, based upon a Tennessee statute, departed from prior decisions of the Court. In *Boettcher* the Court noted that under section 24-5-113(b)(1) of the Tennessee Code Annotated, medical bills are presumed to be reasonable when served, as is the case here, on the other parties at least ninety days before trial. *See id.* at *8. Indeed, Plaintiff's point, if Tennessee law is to be considered, is strengthened by the recent decision of the Tennessee Supreme Court, which expressly held that, in personal injury cases, "the plaintiffs may submit evidence of the injured party's full, undiscounted medical bills as proof of reasonable medical expenses." *Dedmon v. Steelman*, 2017 Tenn. LEXIS 720, at *3 (Tenn. Nov. 17, 2017). The Tennessee Supreme Court further held that "the defendants are precluded from submitting evidence of discounted rates accepted by medical providers from the insurer to rebut the plaintiffs' proof that the full, undiscounted charges are reasonable." *Id.*

On the one hand, the cases cited by Fukae are unpublished district court cases, and thus it is not clear to the Court that these cases are sufficient to constitute an established rule of general maritime law even though Plaintiff has produced no admiralty case to the contrary. In *Koch*, the Eastern District of Louisiana relied on *Tucker* in support of its determination. *Koch*, 2015 U.S. Dist. LEXIS 88610, at *20 n.48 (citing *Tucker*, 2014 U.S. Dist. LEXIS 160265). In *Tucker*, the District of Oregon relied on the Southern District of California case. *Tucker*, 2014 U.S. Dist. LEXIS 160265, at *77 (citing *Asanuma v. United States*, 2014 U.S. Dist. LEXIS 42673, at *7 n.2 (S.D. Cal. Mar. 28, 2014)). *Asanuma*, however, was not an admiralty case. *See Asanuma*, 2014

U.S. Dist. LEXIS 42673, at *1 ("This is a negligence action under the Federal Tort Claims Act for the personal injuries suffered by Plaintiff Tak Asanuma on May 5, 2010. Plaintiff Tak Asanuma suffered injuries after he was involved in a collision while riding a bicycle."). And *Asanuma* in turn relied on California law. *Id.* at *7 n.2 (citing *Hill v. Novartis Pharms. Corp.*, 944 F. Supp. 2d 943 (E.D. Cal. 2013); *Corenbaum v. Lampkin*, 156 Cal. Rptr. 3d 347 (Cal. 2013)).[23] This is not a particularly strong foundation from which the Court might find Fukae's position to be a rule of general maritime law.

On the other hand, Tennessee law is not federal maritime law. But where there is no established rule under general maritime law, federal courts have looked to other sources of law, including state law. *See Marastro Compania Naviera, S.A. v. Canadian Maritime Carriers, Ltd.*, 959 F.2d 49, 53 (5th Cir. 1992) (citing *Conner v. Aerovox, Inc.*, 730 F.2d 835 (1st Cir.1984)); *Byrd v. Byrd*, 657 F.2d 615, 617 (4th Cir. 1981) (citations omitted). State law should not be used, however, if it would "impair the uniformity and simplicity . . . of the federal admiralty law." *Marastro Compania Naviera, S.A.*, 959 F.2d at 53 (quoting *Nissan Motor Corp. v. Md. Shipbuilding & Drydock Co.*, 544 F. Supp. 1104, 1111 (D. Md. 1982)); *see also Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 210 n.8 (1996) (citation omitted) ("The federal cast of admiralty law, we have observed, means that 'state law must yield to the needs of a uniform federal maritime law when this Court finds inroads on a harmonious system[,] but this limitation still leaves the States a wide scope.'"); *cf. Moragne v. States Marine Lines*, 398 U.S. 375, 401–02 (1970) (quoting *The Lottawanna*, 88 U.S. 558, 575 (1875)) (stating that "federal admiralty law should be 'a system of law coextensive with, and operating uniformly in, the whole country'").

---

[23] In *Hill*, the Eastern District of California ultimately excluded evidence of amounts billed but not actually paid as irrelevant under Rule 403 of the Federal Rules of Evidence after a thorough discussion of California's collateral source rule and the *Erie* doctrine. *Hill*, 944 F. Supp. 2d at 961–64.

In such instances, it is appropriate to look to the general common law instead of state law. *See In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex.*, 2011 U.S. Dist. LEXIS 113424, at *30 (E.D. La. Sept. 30, 2011) (quoting *Marastro Compania Naviera, S.A.*, 959 F.2d at 53). *But cf. Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938) ("There is no federal general common law."). Fukae argues that the Court should in fact look to state law, citing *Buccina v. Grimsby*, 157 F. Supp. 3d 704 (N.D. Ohio 2016), and *Jones v. Carnival Corp.*, 2006 U.S. Dist. LEXIS 101999 (S.D. Fla. Jan. 25, 2006), as examples of where federal courts have found no general maritime law addressing admissibility of the difference between the non-discounted amount billed and the discounted amount paid by an insurer. As a result, both courts looked to the relevant State's law for guidance. Fukae then cites to *Johnson v. Trans-Carriers, Inc.*, 2017 U.S. Dist. LEXIS 275 (W.D. Tenn. Jan. 3, 2017), a decision by this Court, in which it held that "an injured plaintiff's full, non-discounted medical bills would not represent the plaintiff's reasonable medical expenses." *Johnson*, 2017 U.S. Dist. LEXIS 275, at *8. But the Court admitted then that its task was "to predict how the Tennessee Supreme Court would rule on the matter [in *Dedmon*]." *Id.* (citation omitted). As discussed above, this Court predicted incorrectly. *See Dedmon v. Steelman*, 2017 Tenn. LEXIS 720, at *3 (Tenn. Nov. 17, 2017). Thus if the Court were to apply Tennessee law to this case, not only would the non-discounted amount billed to Plaintiff be admissible, but the discounted amount actually paid by Hartford would also be *inadmissible*. The Court, however, makes no such application in this Order. At this stage of the proceedings, Fukae is simply not entitled to judgment on this issue. Therefore, the Court finds that Fukae is entitled to summary judgment on future medical expenses but not past medical expenses. Count IV of Plaintiff's Amended Complaint is limited accordingly.

### F.     Plaintiff's Knee and Neck Injuries

Finally, Operation Bass and Fukae have moved the Court for summary judgment on the issue of whether Plaintiff's knee and neck injuries were caused by the accident. Both Defendants argue that Plaintiff cannot carry his burden of proving that these injuries were caused by the accident because he lacks medical evidence of such a causation and that Drs. Brooks and Massey have stated their opinions that Plaintiff's neck and knee injuries were unrelated to the accident. In response, Plaintiff argues that his burden of proving causation is a "featherweight" burden under maritime law and his own opinion that the allision caused his neck and knee injuries is sufficient for him to survive summary judgment on this issue. The Court is not persuaded. There is no material dispute of genuine fact as to whether the allision caused Plaintiff's neck and knee injuries because the undisputed evidence shows that it did not.

Fukae correctly points out that Plaintiff is relying on the slight causation standard applicable under the Jones Act, which would be applicable to Plaintiff's negligence claim against Operation Bass under the Jones Act but not his negligence claim against Fukae under general maritime law. *Cf.* 46 U.S.C. § 30104 (applying the slight causation standard to actions by seamen against their employers); *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 597–98 (6th Cir. 2001). Having already dismissed Plaintiff's Jones Act claim, the Court will only analyze this issue as to Plaintiff's general-maritime-law negligence claim. "Negligence is an actionable wrong under general maritime law, and the elements of that tort are essentially the same as land-based negligence under the common law." *Great Lakes Dredge & Dock Co. LLC v. La. State*, 624 F.3d 201, 211 (5th Cir. 2010) (citation omitted) (internal quotation marks omitted). Thus, in addition to the other elements of a negligence claim, Plaintiff must prove a causal connection between Fukae's conduct and the knee and neck injuries. *See id.* (quoting

*Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000). Plaintiff does not dispute that he had cervical fusion surgery in 2003 or that he tore the ACL in his right knee in 1997. Plaintiff's Third Statement of Facts, ¶¶ 2, 5. Plaintiff does not dispute that no doctor has ever told him that either his neck or knee symptoms were caused by the accident.[24] *Id.* at ¶¶ 4, 7. Plaintiff does not dispute that Dr. Massey testified that Plaintiff's current knee injury is basically the same injury suffered in 1997 and that an untreated ACL tear, like Plaintiff's, will result in an arthritic knee. *Id.* at ¶ 11. Plaintiff does not dispute that Dr. Brooks testified that Plaintiff's complaint of tingling in his hands and right knee pain were unrelated to the accident. *Id.* at ¶ 15. Plaintiff does not dispute that the CT scan of his head and cervical spine performed immediately after the accident showed no evidence of injury to his spine. *Id.* at ¶ 16. Plaintiff argues that his own testimony that the allision caused his neck and knee injuries is sufficient. But even under the featherweight standard that Plaintiff asserts is applicable, the evidence must be medical and not merely the opinion of a layperson. *See Mayhew v. Bell S.S. Co.*, 917 F.2d 961, 963 (6th Cir. 1990) ("[A] medical expert must be able to articulate that there is more than a mere possibility that a causal relationship exists between the defendant's negligence and the injury for which the plaintiff seeks damages."); *Fauver v. Seadrill Americas, Inc.*, 2016 U.S. Dist. LEXIS 98724, at *5–6 (S.D. Miss. July 28, 2016) (citations omitted) ("[T]he plaintiff must present expert medical evidence that there is more than a mere possibility that a causal relationship exists between a Jones Act employer's alleged negligence and a seaman's alleged injury."). Thus, the Court finds that Plaintiff has failed to meet his burden regarding his neck and knee injuries. In light of the undisputed facts of this case, Operation Bass and Fukae are entitled to summary judgment on

---

[24] Plaintiff disputed Operation Bass's statement in paragraph four, but Plaintiff's clarifying statements only assert that he sought and received treatment for his neck injury. Plaintiff's Third Statement of Facts, ¶ 4. There is no statement that a doctor told him the injury was caused by the accident. *Id.*

that issue.  Plaintiff may not recover damages for his neck and knee injuries, and Count IV of his Amended Complaint is limited accordingly.


IV.     **CONCLUSION**

The Court has found that (1) neither Operation Bass nor Fishing Holdings can be held liable under the Jones Act because Fishing Holdings did not employ Plaintiff and Operation Bass was not negligent, (2) no act or omission of Operation Bass or Fishing Holdings rendered the Boat unseaworthy, (3) Plaintiff is not entitled to maintenance and cure from Operation Bass or Fishing Holdings, (4) Plaintiff has no evidence supporting the reasonableness or necessity of future medical expenses but Defendants have stipulated with Hartford the reasonableness and necessity of past medical expense, and (5) Plaintiff has no evidence supporting a causal connection between the accident and his neck and knee injuries.  Accordingly, Fishing Holdings's Motion for Summary Judgment is **GRANTED**, Fukae's Motion for Partial Summary Judgment is **GRANTED IN PART AND DENIED IN PART**, Operation Bass's Motion for Summary Judgment is **GRANTED**, and Operation Bass's Motion for Partial Summary Judgment is **GRANTED**.  As a result, in Case No. 1:14-cv-01226-STA-egb, Operation Bass is entitled to exoneration from liability regarding the injuries suffered by Plaintiff.  The Clerk is **DIRECTED** to enter judgment accordingly.  In Case No. 1:14-cv-02976-STA-egb, Fishing Holdings is entitled to exoneration from liability regarding the injuries suffered by Plaintiff.  The Clerk is **DIRECTED** to enter judgment accordingly.  In Case No. 1:14-cv-01138-STA-egb, Operation Bass and Fishing Holdings are **DISMISSED** entirely.  All that remains of this consolidated matter is the related Case No. 1:14-cv-01138-STA-egb, and in that case, Plaintiff's claim for negligence against Fukae under general maritime law as the Court has dismissed Counts I, II,

and III. Because the Court has found that Fukae was entitled to partial summary judgment, through his Motion or by joining the Motion of Operation Bass, on the issues of future medical expenses and Plaintiff's neck and knee injuries, Count IV of Plaintiff's Amended Complaint is limited accordingly.

**It is so ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
CHIEF UNITED STATES DISTRICT JUDGE

Date: December 5, 2017.